IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

MARK DICKERSON, )
)
    Plaintiff, )
)
v. ) CASE NO. 3-07-1272
) JUDGE WISEMAN
AMERIQUEST MORTGAGE COMPANY and ) MAGISTRATE JUDGE GRIFFIN
CITI RESIDENTIAL LENDING, )
)
    Defendants. )

## DEFENDANTS' REPLY

Defendants Ameriquest Mortgage Company and Citi Residential Lending file this Reply supporting their Motion to Dismiss the Complaint. Defendants moved to dismiss the Complaint based principally on expiration of the statutes of limitations as to Plaintiff's TILA claims, and failure to state a claim as to Plaintiff's fraud claim.

Plaintiff's Response [D.E. No. 41] argues that the TILA recission claim is not time-barred and that the fraud claim has been adequately pled.[1] With respect to the TILA claims, Defendants rest upon their original Memorandum in Support of their Motion to Dismiss. However, with respect to Plaintiff's arguments as to his fraud claim, Defendants reassert that Plaintiff has failed to demonstrate why this case should not be dismissed.

### PLAINTIFF HAS FAILED TO PLEAD FRAUD WITH REQUISITE SPECIFICITY

In the Complaint, Plaintiff states that his claims of fraud are "fraud in the inducement" and "tortious misrepresentation." In his Response, Plaintiff now appears to argue that the

---

[1] Plaintiff, in his Response, does not address Defendants' argument that his TILA claim for damages, pursuant to 15 U.S.C. § 1640, is time-barred by the one-year statute of limitations for such claims and should be dismissed for failure to state a claim.

11856 v1

Complaint contains a claim for "promissory fraud" rather than "tortious misrepresentation." "Fraudulent" or "tortious misrepresentation" and "promissory fraud" are legally distinct. Defendants argued in their Motion and supporting Memorandum that Plaintiff failed to state a claim of tortious misrepresentation, in part because none of the alleged statements in the Complaint related to an existing or past fact. *See, e.g.*, *Oak Ridge Precision Industries, Inc. v. First Tennessee Bank Nat'l Assn.*, 835 S.W.2d 25, 29 (Tenn. Ct. App. 1992) (stating that "[t]he action for fraud fails as a matter of law. All three incidents embody a promise of future actions to loan money to meet the payroll. By definition, they do not misrepresent a past or present fact" and distinguishing fraudulent misrepresentation from promissory fraud.). It is unclear from Plaintiff's Response whether or not he has abandoned a claim of "tortious misrepresentation," but regardless, any claim of tortious misrepresentation must be dismissed.

With respect to Plaintiff's argument that he has stated a claim for "promissory fraud," if Plaintiff intends such a claim to be distinct from his claim of "fraud in the inducement," a separate "promissory fraud" claim impermissibly expands the allegations in the Complaint. However, Plaintiff's "fraud in the inducement" claim can be based *either* upon "false statements of past or present facts or false promises made without the present intent to perform." *Lowe v. Gulf Coast Dev., Inc.*, No. 01-A-01-9010-CH-00374, 1991 Tenn. App. LEXIS 860 at *21 (Nov. 1, 1991) (copy attached). The elements of an action of fraud in the inducement are:

> (1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance.

*Id.* at *20; *Lamb v. Megaflight, Inc.*, 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000). Plaintiff is correct that a claim based on promissory fraud, "must embody a promise of a future action without the present intention to carry out the promise." *Shah v. Racetrac Petroleum Co.*, 338

F.3d 557, 566-67 (6th Cir. 2003) (citation omitted). However, Plaintiff has not adequately pled a claim of fraud in the inducement based on promissory fraud.

First, taking the allegations of the Complaint as true at this stage of the proceedings, the statements allegedly made by an agent of Ameriquest during a phone call in August 2005 are directly related to the terms of a potential future contract. These statements do not rise to the level of fraud in the inducement based on promissory fraud. "Proof of fraud in the inducement or promissory fraud is limited to subject matter which does not contradict or vary the terms that are plainly expressed in the written contract." *Burton v. Hardwood Pallets, Inc.*, No. E2003-01439-COA-R3-CV, 2004 Tenn. App. LEXIS 175 at *5 (Tenn. Ct. App. Mar. 22, 2004) (copy attached). Plaintiff later signed a contract with different terms than what was alleged to have been advertised to him on the telephone in August 2005, but Plaintiff has not alleged that any statements or additional representations were made to him that are outside the scope of loan documents or a mortgage. The doctrine of promissory fraud is inapplicable when the "alleged fraudulent statement expressly negates" a written contract. In promissory fraud cases, the "alleged fraudulent statement [does not] contradict a written contract," but instead, relates to "other collateral matters between the parties." *Farmers & Merchant's Bank v. Petty*, 664 S.W.2d 77, 81 (Tenn. Ct. App. 1983) (citing *Fowler v. Happy Goodman Family*, 575 S.W.2d 496 (Tenn. Ct. App. 1978)).

The alleged statements at issue in the August 2005 phone call do not apply to collateral matters; they apply to the terms of the written contract. Plaintiff admits in the Complaint that the documents given to him at the closing demonstrate the terms of his payment and interest rate. (Compl., ¶¶ 17, 18). The Notice of Right to Cancel also disclosed that the mortgage contained an "Adjustable Rate." This is not a case in which Defendants made false promises to Plaintiff

that were collateral or incidental to the terms of the loan documents themselves. Accordingly, Plaintiff's claim of fraud in the inducement based on promissory fraud, premised upon the statements allegedly made in the August 2005 phone call described in Paragraph 8 of the Complaint, fails to state a claim and should be dismissed.

Second, Plaintiff's Response does not demonstrate why Plaintiff's fraud in the inducement claim should not be dismissed for failure to comply with the pleading requirements of Rule 9(b). However, the only specific statements alleged in the Complaint that were made prior to the closing consist of a theoretical contract to be made in the future and a description of what Ameriquest "could" do. (Compl. ¶ 8). Plaintiff now argues in the Response that the Complaint states that he relied upon these statements. Defendants aver that this is entirely unclear from the Complaint, as Plaintiff also details numerous statements allegedly made by a Mr. William Moody subsequent to the loan closing. However, to the extent that Plaintiff asserts Paragraph 31 of the Complaint relates to the August 2005 phone call, the claim still fails as Plaintiff has not pled that any such reliance was reasonable, or that circumstances existed that manifested a reasonable right to rely upon these statements. This element is missing from Plaintiff's Complaint altogether, making it impossible for Defendants to fully respond to Plaintiff's claim.

Further, Plaintiff's Response describes these statements as "assurances" and "promises," but it is clear from the face of the Complaint that these statements were mere possibilities. (Compl. ¶ 8). As pled, these statements do not amount to "false statements" and/or "material facts." Plaintiff has not pled the existence of any specific promise, has not pled that he relied on the alleged that he relied on the statements in signing the loan documents, and has not alleged that reliance on theoretical statements or descriptions of what Ameriquest "could" do was reasonable. Regardless of Plaintiff's arguments in his Response, Plaintiff did not plead in the

Complaint that the August 2005 caller had any fraudulent intent or scheme.  Plaintiff has not otherwise pled the existence of any affirmative statement or promise, much less the specific "time, place and content of the misrepresentations, the defendant's fraudulent intent; the fraudulent scheme; and the injury from the fraud," such that Ameriquest would be on notice as to how exactly it is alleged to have fraudulently induced Plaintiff to sign a contract for a loan in which the terms of the loan were clearly disclosed on the loan documents that Plaintiff signed.

## CONCLUSION

For the foregoing reasons, Defendants submit that Plaintiff's Complaint fails to state any claim upon which relief could be granted.  Therefore, Defendants respectfully request that the Court grant Defendants' Motion to Dismiss and enter judgment, dismissing this action with prejudice, at Plaintiff's costs, and for such other, further relief as equitable and just under the circumstances.

Respectfully submitted this 22nd day of May, 2008.

/s/ Katherine K. Layhew
David W. Houston, IV (TN Bar# 020802)
Katherine Knight Layhew (TN Bar # 022274)
**BURR & FORMAN LLP**
700 Two American Center
3102 West End Avenue
Nashville, Tennessee 37203
Telephone:  (615) 724-3219
Facsimile: (615) 724-3319
E-mail:  klayhew@burr.com

**CERTIFICATE OF SERVICE**

  I hereby certify that on May 22, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to the following:

Jessica Myers, BPR# 022595
David J. Tarpley, BPR# 4059
Legal Aid Society of Middle Tennessee and the Cumberlands
300 Deaderick Street
Nashville, TN  37201
(615) 780-7138
(Attorneys for Plaintiff)

              /s/ Katherine K. Layhew
              Katherine K. Layhew (TN Bar# 022274)
              **BURR & FORMAN LLP**

LEXSEE 1991 TENN. APP. LEXIS 860

CHARLES T. LOWE, JR., and wife BOBBY JANE LOWE, and JACK R. CATO and wife, RUTH M. CATO, Plaintiffs/Appellees, v. GULF COAST DEVELOPMENT, INC., SHONEY'S INN OF LEBANON, INC., and MOORE AND ASSOCIATES, INC., Defendants/Appellants

Appeal No. 01-A-01-9010-CH-00374

Court of Appeals of Tennessee, Middle Section, at Nashville

*1991 Tenn. App. LEXIS 860*

November 1, 1991, Filed

**PRIOR HISTORY:**  [*1] Appeal from the Chancery Court for Wilson County at Lebanon, Tennessee, No. 7490, The Honorable Bobby H. Capers, Judge.

**DISPOSITION:**   REVERSED IN PART AND REMANDED

**COUNSEL:** Attorney for Plaintiffs/Appellees: Comer L. Donnell, Lebanon, Tennessee.

Attorney for Defendants/Appellants: Peter H. Curry, Boult, Cummings, Conners & Berry, Nashville, Tennessee.

**JUDGES:** William C. Koch, Jr., Judge. Henry F. Todd, Presiding Judge, Ben H. Cantrell, Judge, concur.

**OPINION BY:** KOCH

**OPINION**

*OPINION*

This appeal involves a dispute arising from the development and construction of a Shoney's Inn in Wilson County. The owners of the property on which the motel was built filed suit in the Chancery Court for Wilson County, alleging that the project's principals had built a smaller motel than they had promised to build and that the motel encroached on one of their easements. The trial court, sitting without a jury, found for the property owners, and the project's principals have appealed. We have determined that the trial court's decision must be reversed.

I.

Charles T. Lowe, Jr., Jack R. Cato, and their wives are the joint owners of three contiguous parcels of property in Lebanon near the intersection of Interstate 40 and Highway 231. [*2] They leased one of the parcels to the operators of a Bonanza restaurant in 1977 but left the remaining two tracts, containing 3.49 and 4.29 acres respectively, undeveloped.

In July or August, 1986, Mr. Lowe and Mr. Cato were approached by representatives of Gulf Coast Development, Inc. ("Gulf Coast") who were interested in leasing the middle 3.49-acre tract for the development of a Shoney's Inn. Gulf Coast is a Tennessee corporation wholly owned by Leon Moore that provides management services to other businesses.

Mr. Lowe and Mr. Cato were receptive to the idea. On September 3, 1986, Gulf Coast applied to the Wilson County Industrial Development Board for a $ 4,000,000 bond issue to be used for "the construction of an approximately 130-room Shoney's Inn lodging facility." The board gave its initial approval to the bond issue on September 25, 1986.

On October 9, 1989, Gulf Coast submitted a preliminary site plan to the Wilson County Planning Commission showing that the proposed project would proceed in two phases and that the first phase would have 130 rooms. Sometime during the ensuing two weeks, the developers reduced the number of rooms in the first phase. On October 22, 1986, Gulf [*3] Coast incorporated a wholly-owned subsidiary called Shoney's Inn of Lebanon, Inc. ("Shoney's Inn") to own and operate the motel. On the same day, Shoney's Inn entered into a construction contract with Moore & Associates, Inc. ("Moore & Assoc."), another one of Mr. Moore's companies, to build a 111-room motel.

On December 4, 1986, Gulf Coast and Shoney's Inn requested the industrial development board's final approval of $3,500,000 in bonds for "financing the construction and equipping of an approximately 130-room Shoney's Inn lodging facility." On December 22, 1986, the board gave final approval to the bond issue, and Gulf Coast, with the board's approval, assigned all its interest in the project to Shoney's Inn. Shoney's Inn also contracted with Gulf Coast to manage the motel once it was constructed.

The Lowes, the Catos, and a representative of Shoney's Inn signed the ground lease agreement and related documents on the same day the board approved the bond issue. The lease was for thirty years with twelve five-year renewal options and called for an annual base rent of $40,000 and for "annual overage rent" equal to three percent of the amount by which the gross sales exceeded the [*4] base rent.

The lease specifically recognized two ingress and egress easements. The first was a fifty-foot easement parallel to Highway 231 intended to provide access to the remaining undeveloped tract, and the second was a pre-existing thirty-foot easement providing access to all three tracts. The parties also signed a separate easement agreement requiring Shoney's Inn to relocate an existing access ramp.

The industrial development board reviewed and approved the documents relating to the bond issue on February 26, 1987. The introductory statement in the March 1, 1987 prospectus stated that the bond "proceeds . . . will be used . . . to construct and equip a 111 room Shoney's Inn motel." On March 3, 1987, the Wilson County Planning Commission received the motel's site plan showing that the motel would have 111 rooms. Moore & Associates, Inc. obtained a building permit on May 29, 1987, and construction commenced shortly thereafter.

The dealings between the parties began to sour in July, 1987 after Mr. Lowe visited the construction site. On this occasion, Mr. Lowe insisted that he discovered the Shoney's Inn was constructing signs and other improvements on the fifty-foot easement and [*5] that the motel would have only 111 rooms. He raised these matters with Shoney's Inn officials, but the construction continued without alteration. Mr. Lowe took no further action, and the motel was completed and opened for business in late 1987.

In June, 1988, Mr. Lowe received formal notice from the City of Lebanon that the motel was encroaching into the regulatory floodway of Sinking Creek. On August 26, 1988, Mr. Lowe gave Shoney's Inn formal notice of what he viewed to be nine "violations of construction and the items in the Lease." Among the issues discussed in Mr. Lowe's letter were the number of rooms in the motel, the improvements on the fifty-foot easement, and the encroachment on the floodway.

Shoney's Inn responded to a number of Mr. Lowe's concerns and even offered to remove the improvements on the fifty-foot easement if they interfered with ingress and egress to the remaining undeveloped tract. Mr. Lowe was dissatisfied with the response, and so he and the other owners of the property filed suit against Gulf Coast, Shoney's Inn, and Moore & Assoc. on October 4, 1988.

The complaint, although somewhat inartfully worded, alleged that the motel's principals had fraudulently [*6] induced the Lowes and the Catos to enter into the lease by representing that they intended to build a 130-room motel. It also alleged various breaches of the ground lease, including the failure to construct 130 rooms, constructing improvements on the fifty-foot easement, and encroaching on the floodway. The complaint sought $6,000,000 in actual and punitive damages, the removal of the encroachments, and the rescission or reformation of the lease agreement.

The trial court heard the proof on January 30, 1990 and filed its final order on May 22, 1990. It found that the Lowes and the Catos would not have entered into the lease had it not been for the representations that a 130-room motel would be built on the property. It also found that the motel was encroaching on the fifty-foot easement. Accordingly, it awarded damages for the decrease in the expected amount of annual overage rent due to the construction of 111 instead of 130 rooms and directed the motel to remove the improvements on the fifty-foot easement if the property owners requested their removal.

II.

We turn first to the trial court's decision to treat Gulf Coast, Shoney's Inn, and Moore & Assoc. as the same entity and to [*7] render a judgment against all three corporations. The evidence does not support disregarding the separate identity of these corporations with regard to all the property owners' claims. The property owners, however, have asserted one claim that, if substantiated, would be applicable to two of the corporations.

A.

Shoney's Inn is the owner of the motel and is the entity to whom the Lowes and the Catos leased the property. It is a wholly-owned subsidiary of Gulf Coast, and it has contracted with Gulf Coast to manage the motel. It is also the entity that contracted with Moore & Assoc. to construct the motel.

All three of these corporations have common officers and directors. Leon Moore owns all of Gulf Coast's

stock and is president of Gulf Coast, Shoney's Inn, and Moore & Assoc. Richard Johnson is the executive vice president of all three corporations. Throughout this project, both Mr. Moore and Mr. Johnson dealt directly with the property owners and with the local officials without identifying clearly on which corporation's behalf they were acting at any particular time.

All corporations maintain their offices at the same location and, on occasion, share stationery. While they have [*8] contracted with each other, and Gulf Coast has made loans to Shoney's Inn, the corporations have not commingled funds. Each corporation is audited separately.

B.

A corporation has a legal identity separate and distinct from its shareholders, officers, directors, and other affiliated entities. *Hadden v. City of Gatlinburg, 746 S.W.2d 687, 689 (Tenn. 1988)*; *Neese v. Fireman's Fund Ins. Co., 53 Tenn. App. 710, 717, 386 S.W.2d 918, 921 (1964)*; 1 W. Fletcher, Cyclopedia on the Law of Private Corporations §§ 25, 28 (rev. perm. ed. 1990) (hereinafter "Fletcher"). The courts, as a general matter, recognize and preserve this separateness but will disregard it when the corporation is a sham or dummy or when necessary to accomplish justice. *Electric Power Bd. v. St. Joseph Valley Structural Steel Corp., 691 S.W.2d 522, 526 (Tenn. 1985)*; *Fidelity Trust Co. v. Service Laundry Co., 160 Tenn. 57, 61-62, 22 S.W.2d 6, 8 (1929)*; *Post Sign Co. v. Jemc's, Inc., 48 Tenn. App. 13, 24, 342 S.W.2d 385, 390 (1960)*.

Parent and subsidiary corporations are generally presumed [*9] to be separate, and thus parent corporations are not liable for the acts of their subsidiaries. However, a subsidiary's separateness will be disregarded when the corporations are so completely integrated that neither can be viewed realistically as a separate economic entity and when adhering to the rule of separateness will produce injustice or inequity. *Stigall v. Wickes Mach., 801 S.W.2d 507, 510-11 (Tenn. 1990)*; Fletcher § 43.

More than stock control, interlocking directors and officers, or similar named or office locations is required to rebut the presumption of separateness. *Continental Bankers Life Ins. Co. v. Bank of Alamo, 578 S.W.2d 625, 631 (Tenn. 1979)*; Fletcher § 43.20. Parties seeking to convince a court to disregard separate corporate entities must prove the following:

(1) that the parent corporation, at the time of the transaction complained of, exercised complete dominion over its subsidiary's policies and business practices, so that as to the transaction under attack, the subsidiary had no separate mind, will, or existence of its own;

(2) the parent's control must have been used to commit fraud or wrong, to perpetrate the [*10] violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third-parties' rights; and

(3) the parent's control and breach of duty or wrong must be the proximate cause of the injury or unjust loss complained of.

*Continental Bankers Life Ins. Co. v. Bank of Alamo, 578 S.W.2d at 632*; *Electric Power Bd. v. St. Joseph Valley Structural Steel Corp., 691 S.W.2d at 526*. The absence of any one of these elements prevents piercing the corporate veil. *Lubrizol Corp. v. Cardinal Constr. Co., 868 F.2d 767, 770-71 (5th Cir. 1989)*; *Hassinger v. Tideland Elec. Membership Corp., 622 F. Supp. 146, 151-52 (E.D.N.C. 1985)*; *State Dep't. of Envtl. Protection v. Ventron Corp., 94 N.J. 423, 468 A.2d 150, 164-65 (1983)*; Fletcher § 43.10.

C.

The trial court explained its decision to disregard the separate identities of the three corporate defendants as follows:

In this case, all corporations should be treated as the same entity. The transactions are so interrelated, with the same individual owning all corporations, they had to have known of all of [*11] the agreements because the owner of one corporation is the owner of all corporations and participated in all negotiations.

The trial court made no findings with regard to the second and third elements of the "instrumentality rule" adopted in the Continental Bankers Life Ins. Co. case. Accordingly, we can reach no conclusion other than that its decision is flawed because it is based only on the control element of the instrumentality rule.

Corporate separateness will not be disregarded unless the corporate structure is an artifice "created for the purpose of committing fraud or injury upon the complaining victim." *Stigall v. Wickes Mach., 801 S.W.2d at 511*. The property owners have not proved that Mr. Moore set up these corporations for an improper purpose or that their claimed injuries were caused by Mr. Moore's decision to conduct his business using three distinct corporate entities instead of one. Therefore, the trial court erred by deciding to disregard the separateness of the corporate defendants.

D.

Our finding that the trial court did not have grounds to disregard the separate identity of the corporate defendants does not end the inquiry. The property [*12] owners could still recover from all corporations if they have

alleged and proved claims applicable to each corporation separately.

Insofar as is relevant to this appeal, the property owners' complaint alleged causes of action for (1) fraudulent inducement to enter into a contract, (2) breach of contract, and (3) encroachment on an easement. While the complaint alleges no colorable claim against Moore & Assoc., it alleges breach of contract and encroachment claims against Shoney's Inn and a fraudulent inducement to enter into a contract claim against Gulf Coast and Shoney's Inn.

The property owners assert that they were fraudulently induced to enter into the ground lease by assurances and promises that the motel would contain 130 rooms. Throughout the negotiations, they dealt with Mr. Moore and Mr. Johnson who, at least until October, 1986, represented Gulf Coast. The property owners continued to deal with Mr. Moore and Mr. Johnson after Shoney's Inn was incorporated in October, 1986. While they were aware that Shoney's Inn had been incorporated to own the motel, they never knew with certainty on which corporation's behalf either Mr. Moore or Mr. Johnson were acting at any particular [*13] time.¹

> 1  The same ambiguity concerning Mr. Moore's and Mr. Johnson's roles surfaced during Mr. Moore's testimony at trial. The trial court asked: "When I talk with Mr. Moore, what capacity are we talking or is he testifying in?"

Corporations act through their officers and directors. *Whitehaven Util. Dist. v. Ramsay, 215 Tenn. 435, 443, 387 S.W.2d 351, 354 (1964)*; *Batey v. D. H. Overmyer Warehouse Co., 60 Tenn. App. 310, 327, 446 S.W.2d 686, 694 (1969)*. Prior to October 22, 1986, any representations Mr. Moore and Mr. Johnson made must have been made on behalf of Gulf Coast because Shoney's Inn did not exist. After Shoney's Inn was incorporated, Mr. Moore and Mr. Johnson undertook to act on behalf of both corporations without differentiating clearly between the two insofar as their dealings with the property owners were concerned.

Since Mr. Moore and Mr. Johnson were acting on behalf of both corporations, their representations after October 22, 1986 concerning [*14] the number of the rooms that the motel would have are attributable to both Gulf Coast and Shoney's Inn. It follows, therefore, that if the property owners made out a case for fraudulent inducement to enter into a contract, based even in part on representations made after October 22, 1986, both Gulf Coast and Shoney's Inn could be liable for damages.

The same cannot be said with regard to the breach of contract claim. The property owners knew they were contracting with Shoney's Inn, not Gulf Coast. No ambiguity existed concerning on which corporation's behalf Mr. Johnson was acting when he signed the lease and related documents. His signature shows clearly that he executed the documents in his capacity as executive vice president of Shoney's Inn. Therefore, only Shoney's Inn can be liable on the property owners' breach of contract claim, if it is made out.

III.

The corporate defendants also take issue with the trial court's consideration of parol evidence concerning the parties' negotiations leading up to the execution of the ground lease agreement. They argue that this evidence runs afoul of the principle of integration, the parol evidence rule, and the statute of frauds. We disagree.

[*15] The principle of integration embodies the rule that all prior statements or negotiations are merged into a written contract intended by the parties to be a complete expression of their agreement. *Magnolia Group v. Metropolitan Dev. & Hous. Agency, 783 S.W.2d 563, 566 (Tenn. Ct. App. 1989)*; *Bringhurst v. Tual, 598 S.W.2d 620, 622 (Tenn. Ct. App. 1980)*. It does not apply in cases involving fraud or mistake, *Young v. Cooper, 30 Tenn. App. 55, 69-70, 203 S.W.2d 376, 382-83 (1947)*, and, therefore, it should not be used to restrict the scope of the proof with regard to the property owners' fraudulent inducement claim. The evidence in cases of this sort invariably comes from the statements made during the negotiations leading up to the execution of a written contract.

Similarly, parties cannot use parol evidence to vary the terms of a written contract, *Clayton v. Haury, 224 Tenn. 222, 226, 452 S.W.2d 865, 867 (1970)*, or to prove the existence of an oral contract required to be in writing. However, neither the parol evidence rule nor the statute of frauds prevents the use of parol evidence [*16] to prove a fraudulent inducement to enter into a contract claim. *Brungard v. Caprice Records, Inc., 608 S.W.2d 585, 588 (Tenn. Ct. App. 1980)*; *Haynes v. Cumberland Builders, Inc., 546 S.W.2d 228, 231 (Tenn. Ct. App. 1976)*; *Southern States Dev. Co. v. Robinson, 494 S.W.2d 777, 782 (Tenn. Ct. App. 1972)*.

Evidence inadmissible for one purpose may be admissible for another. *Southern Ry. v. Hooper, 16 Tenn. App. 112, 116, 65 S.W.2d 847, 850 (1932)*; Tenn. R. Evid. 105. Thus, even though the evidence concerning the representations Mr. Moore and Mr. Johnson made prior to the signing of the lease agreement was inadmissible with regard to the breach of contract claim, it was admissible with regard to the property owners' fraudulent inducement claim. Accordingly, the trial court correctly overruled the objection to this evidence.

IV.

*The Breach of Contract Claim*

The property owners' breach of contract claim is based on their assertion that Section 5, Paragraph 1 of the December 22, 1986 ground lease agreement required the construction of a 130-room motel. [2] This paragraph states:

5. CONSTRUCTION [*17] AND USE OF IMPROVEMENTS: Lessee intends to use the Premises for the operation of a Shoney's Inn. All construction, together with all future modifications or improvements to the Premises, shall be made solely at the Lessee's expense, and shall require no further consent or approval from Lessor. Lessor hereby represents and warrants that sewer . . . service . . . is available by way of lines and easements for all of said services (which lines and easements either exist on the Premises or at least one boundary line of the Premises) . . . and that the services are of sufficient capacity to serve the Premises assuming the Premises to be fully developed and used for a one hundred thirty (130) room Shoney's Inn. Lessor shall pay all expenses in providing such . . . services to the Premises. Lessor and lessees shall each pay one-half (1/2) of any expenses necessary to get water service to the property line. [3]

We do not find that Paragraph 5 requires Shoney's Inn to construct a 130-room motel.

> 2   The property owners also rely on Paragraph 13 of the ground lease agreement. Paragraph 13 simply embodies the property owners' warranty that "the premises are zoned to permit the used contemplated pursuant to Paragraph 5 hereof."

[*18]

> 3   The omitted portions of Paragraph 5 were deleted by the parties when they signed the ground lease agreement.

When a dispute involves a written contract, this court must first examine the contract itself to determine whether it directly addresses the matter at issue. If it does, then the court need look no further than the contract itself and need only enforce it according to its terms. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc., 521 S.W.2d 578, 580 (Tenn. 1975)*; *Bokor v. Holder, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986)*. If, however, the contract is ambiguous on the matter at issue, then the court must construe the ambiguous language in light of the entire agreement giving the words used their natural and ordinary meaning. *Cocke County Bd. of Highway Commrs. v. Newport Utils. Bd., 690 S.W.2d 231, 237 (Tenn. 1985)*; *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co., 725 S.W.2d 948, 951 (Tenn. Ct. App. 1986)*.

Section 5 is not ambiguous. Rather than obligating Shoney's Inn to build a 130-room motel, [*19] it simply contains the property owners' warranty that the sewer service to the property is sufficient to accommodate a motel containing up to 130 rooms. It states only that Shoney's Inn intends to use the property for a Shoney's Inn and that Shoney's Inn may construct all improvements without the property owners' consent or approval. Accordingly, we need go no further than the lease agreement itself to determine that the property owners have no breach of contract claim based on the language in Section 5.

V.

*The Fraudulent Inducement Claim*

We turn next to the property owners' claim that they were induced to sign the ground lease agreement by Mr. Moore's and Mr. Johnson's misrepresentations concerning their intention to build a 130-room motel. Even if we accede to the trial court's finding that Mr. Moore and Mr. Johnson "represented at all times that 130 rooms would be built," [4] we find that the property owners did not prove all the elements of a fraudulent inducement claim.

> 4   The documentary evidence is inconsistent with Mr. Lowe's testimony that both Mr. Moore and Mr. Johnson stated repeatedly that the motel would have 130 rooms. However, we recognize that the trial court based its decision on its view of the credibility of the witnesses. Accordingly, we must give great weight to this particular finding. *Tenn-Tex Properties v. Brownell-Electro, Inc., 778 S.W.2d 423, 426 (Tenn. 1989)*.

[*20]

The cause of action for fraudulent inducement to enter into a contract is closely related to a claim for fraudulent misrepresentation. It arises when a person's willingness to enter into a contract is caused by another person's fraudulent misrepresentations with regard to a matter material to the contract. *Lovato v. Catron, 20 N.M. 168, 148 P. 490, 492 (1915)*.

There are five elements to a fraudulent inducement cause of action: (1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance. *Gibraltar Savs. v. LDBrinkman Corp., 860 F.2d 1275, 1298-99 (5th Cir. 1988)*; *Touche Ross Ltd. v. Filipek, 7*

*Haw. App. 473, 778 P.2d 721, 726 (1989)*; *Sanfillipo v. Rarden, 24 Ohio App. 3d 164, 493 N.E.2d 991, 994 (1985)*. These elements are essentially the same as those required in an action for fraud under Tennessee law. See [*21] *Stacks v. Saunders, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)*.

Like claims for fraud, claims for fraudulent inducement to enter into a contract may involve false statements of past or present facts or false promises made without the present intent to perform. *Gibraltar Savs. v. LDBrinkman Corp., 860 F.2d at 1299*; *Touche Ross Ltd. v. Filipek, 778 P.2d at 726*; see also *Brungard v. Caprice Records, Inc., 608 S.W.2d 585, 590 (Tenn. Ct. App. 1980)* (elements of a promissory fraud cause of action). If the claim rests on promissory fraud, the plaintiff must prove more than a "subsequent failure to keep the promise." *Farmers & Merchants Bank v. Petty, 664 S.W.2d 77, 80-81 (Tenn. Ct. App. 1983)*. The plaintiff must prove that the person to be charged had no intention to honor the promise at the time it was made. See *Fowler v. Happy Goodman Family, 575 S.W.2d 496, 499 (Tenn. 1978)*.

The property owners have not proved four of the elements of their fraudulent inducement claim. First, they have not proved that Mr. Moore and Mr. Johnson did not intend to build a 130-room [*22] motel when they made the statements attributed to them. Second, they have not proved that Mr. Moore and Mr. Johnson made the statements solely to induce them to lease their property. Third, they have not proved that the statements concerning the size of the motel were material. Fourth, they have not proved that they were injured by these statements.

The property owners presented evidence that representatives of Gulf Coast and Shoney's Inn stated that they planned to build a 130-room motel and that the motel, as built, contained only 111 rooms. They presented no proof that Gulf Coast and Shoney's Inn planned all along to build a 111-room motel but promised to build a 130-room motel simply to induce the property owners to sign the lease. The evidence that the motel has only 111 rooms, without more, is insufficient to prove that Gulf Coast and Shoney's Inn lacked the intention to build a 130-room motel when the representations concerning the size of the motel were made. See *Farmers & Merchants Bank v. Petty, 664 S.W.2d at 80-81*.

A statement is material or involves a material fact if it will likely affect the conduct of a reasonable person. 2 F. Harper, F. James & [*23] O. Gray, The Law of Torts § 7.9 (2d ed. 1986); 12 S. Williston, A Treatise on the Law of Contracts § 1515C (3d ed. 1970). Accordingly, a matter is material if

(a) a reasonable [person] would attach importance to its existence or non-existence in determining his [or her] choice of action in the transaction in question; or

(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable [person] would not so regard it.

*Restatement (Second) of Torts § 538(2)* (1976).

Notwithstanding the property owners' arguments, a 19-room difference in the size of the motel is not material under the facts of this case. That the additional rooms would increase the value of the motel at the end of the lease is speculative at best. The initial term of the lease is thirty years, and the lessees have options to extend the lease for an additional sixty years. The property owners did not prove that the present structure would be standing at the end of ninety, or even thirty, years and offered no evidence of the value of the improvements in 2016 or at any time [*24] thereafter.

Similarly, the property owners put on no reliable proof that the nineteen additional rooms would have increased their income from the lease. They are entitled to overage rent only when the gross sales in a particular year exceeds the amount of the base rent. It is uncontradicted that the motel's gross sales must exceed $ 1,333,000 before the property owners are entitled to overage rent and that the motel's gross sales during its first two years of operation were $ 546,000 and $ 610,000 respectively. The motel's occupancy rate has been far below projections, and its gross sales have been less than half of what would trigger the payment of the overage rent. The only reasonable conclusion to be drawn from these facts is that the lack of nineteen rooms in a motel that is usually only half full has not affected the property owners' lease income.

We also conclude, for many of the same reason, that reasonable, experienced business persons - such as the parties in this case - would not have attached much importance to a 19-room variance in the size of the motel. Notwithstanding their after-the-fact protestations, the property owners have not demonstrated that doing so was reasonable [*25] or that the lessees knew or should have known that the construction of a motel containing exactly 130 rooms was of fundamental importance to them. The speculative nature of their proof of damaged also undermines their proof that they have been damaged economically because the motel has 111 instead of 130 rooms.

*VI.*

The final issue concerns the fifty-foot easement retained by the property owners to give them access to their adjoining property. Shoney's Inn asserts that the trial court erred by concluding that it had encroached on the easement and that it must construct a paved roadway over the easement for the property owners' use. For their part, the property owners assert that the trial court erred by failing to award them damages for the loss of use of the remaining property stemming from the encroachment.

A.

The easement at issue is found in "Exhibit B" of the December 22, 1986 ground lease agreement. It states simply that there is a

fifty (50) foot ingress and egress easement parallel to U.S. Highway 231 as shown on the survey of A & A Engineers, Inc. dated September 25, 1986.

By its own terms, the easement is for "ingress and egress." No language in either the lease [*26] agreement or the survey plat states or infers that the parties intended the easement to be exclusive.

By its own admission, Shoney's Inn has erected improvements on the easement, including two signs, a street light, a catch basin, and an electrical conduit. It was Mr. Lowe' discovery of the signs in July, 1988 that precipitated much of the present dispute. Mr. Lowe has insisted dogmatically that Shoney's Inn cannot place may improvements on the easement, while Shoney's Inn has repeatedly offered to remove the improvements when they obstruct access to the adjoining property. The property owners have provided no convincing evidence that the improvements have interfered with access to their adjoining property.

The trial court determined that the easement provides the property owners with "an unobstructed, useable easement to their adjacent land." It also found that the two signs were not presently obstructing access to the adjacent land and that the property owners had not lost "any rental value of their remaining tract of land." Accordingly, the trial court concluded that Shoney's Inn would not be required to remove the signs unless they became "an obstacle to Plaintiffs' development [*27] of their remaining property." The trial court also determined that Shoney's Inn would be required to "prepare, pave, and keep in good repair an easement to Plaintiffs' remaining property" if the signs were removed.

B.

An easement is an interest in property that confers on its holder an enforceable right to use another's property for a specific purpose. *Brew v. Van Deman, 53 Tenn. (6 Heisk.) 433, 436 (1871)*; Clayton v. Wise, 1 Tenn. Civ. App. (Higgins) 620, 638-39 (1910); 3 R. Powell & P. Rohan, The Law of Real Property para. 405 (1991) ("Powell & Rohan"); 2 G. Thompson, The Modern Law of Real Property § 315 (1980) ("Thompson"); 2 American Law of Real Property § 8.4 (A. J. Casner ed. 1952).

An easement does not work a disposition of the holder of the servient estate. *Yates v. Metropolitan Gov't, 60 Tenn. App. 719, 726, 451 S.W.2d 437, 440-41 (1969)*. The owner of the servient estate continues to enjoy all the rights and benefits of its interest in the property, *Barnard v. Gaumer, 146 Colo. 409, 361 P.2d 778, 780 (1961)*; Thompson § 425, at 647, and the holder of the [*28] easement has no right to exclude others from the use or alteration of the premises as long as there is no interference with the easement. *Yates v. Metropolitan Gov't, 60 Tenn. App. at 726, 451 S.W.2d at 441*.

There is one exception to this general rule. If an easement is exclusive, the owner of the servient estate loses its right to use the easement along with the easement holder. *Bijou Irr. Dist. v. Empire Club, 804 P.2d 175, 183 (Colo. 1991)*; *Stephens v. Dobbins, 511 So. 2d 652, 653 (Fla. Dist. Ct. App. 1987)*; *Latham v. Garner, 105 Idaho 854, 673 P.2d 1048, 1050-51 (1983)*; Restatement (First) of Property § 493 comm. c (1944). Exclusivity will generally not be implied unless it is necessary for the use of the easement. *Capitol Rod & Gun Club v. Lower Colorado River Auth., 622 S.W.2d 887, 893-94 (Tex. Civ. App. 1981)*.

The nature and extent of an easement is derived from the language of the grant or reservation by which it was created, *Foshee v. Brigman, 174 Tenn. 564, 567, 129 S.W.2d 207, 208 (1939)*, aided by the concomitant circumstances [*29] showing the parties' intentions. *Henry v. Tennessee Elec. Power Co., 5 Tenn. App. 205, 208 (1927)*; Powell & Rohan para. 415[2].

The easement involved in this case is not exclusive and is simply for "ingress and egress" to the adjoining property. Thus, the holders of the easement are entitled to use it only to the extent necessary and with as little burden on the servient estate as possible. *Horton v. Shacklett, 20 Tenn. App. 72, 76, 95 S.W.2d 936, 938 (1936)*. Shoney's Inn is entitled to use the property in any reasonable way that does not interfere with the easement holders' rights. Thompson §§ 427, 431; 2 American Law of Real Property § 8.66, at 279 (A. J. Casner ed. 1952).

We concur with the trial court's finding that the improvements are not interfering with the property owners' easement rights. The evidence supports the conclusion that the improvements have not obstructed the property owners' access to the adjoining property. The improvements, however, are not encroachments because the

easement is non-exclusive, and Shoney's Inn is entitled to use the property in any reasonable manner that does not interfere with the property [*30] owners' easement rights.

Throughout these proceedings, Shoney's Inn has recognized that it must remove any improvements within the easement that actually interfere with the property owners' use of the easement. However, neither the law nor the language of the easement requires Shoney's Inn to construct or maintain a roadway for the property owners' use.

The holder of an easement cannot materially increase the easement's burden or impose new and additional burdens on the servient estate. *Mize v. Ownby, 189 Tenn. 207, 211, 225 S.W.2d 33, 35 (1949)*; *Ogle v. Trotter, 495 S.W.2d 558, 565-66 (Tenn. Ct. App. 1973)*; *Adams v. Winnett, 25 Tenn. App. 276, 281, 156 S.W.2d 353, 357 (1941)*. While the holders of an easement may construct a road to facilitate their use of the easement, *Schmutzer v. Smith, 679 S.W.2d 453, 455 (Tenn. Ct. App. 1984)*, requiring the lessees to construct and maintain a roadway solely for the property owners' use would be imposing a new and additional burden on the servient estate. See Thompson §§ 428, 429.

C.

The property owners also take issue with the trial [*31] court's decision that they are not entitled to monetary damages for the loss of use of the adjoining tract. We concur with the trial court's finding that the improvements have not obstructed the property owners' use of the easement and that the property owners have not lost "any rental value of their remaining tract." We have also found that the improvements are not encroachments, and we now find that there is no evidence that the property owners have been damaged in any way by the improvements the lessee constructed in the easement. Accordingly, we affirm the trial court's denial of damages for interference with their easement rights.

VII.

We affirm the portion of the May 22, 1990 order requiring Shoney's Inn to remove the improvements from the easement if they interfere with the property owners' reasonable use of the easement. We reverse the remainder of the trial court's decision and remand the case for the entry of an order dismissing the remainder of the complaint, including the claim for attorney's fees and costs. [5] We also tax all costs, jointly and severally, against Charles T. Lowe, Jr., Bobby Jane Lowe, Jack R. Cato, and Ruth M. Cato for which execution, if necessary, [*32] may issue.

> 5  The lease agreement entitled the parties to recover attorney's fees and costs only when it was necessary to employ an attorney "on account of breach of default by one party hereto of any of its obligations hereunder." Since we have found no breach or default, the property owners are not entitled to recover their legal expenses. The relief with regard to the easement was substantially what Shoney's Inn agreed to do before the trial of this case.

Case 1:08-cv-03252　　　Document 34-2　　　Filed 05/22/2008　　　Page 9 of 9

LEXSEE 2004 TENN. APP. LEXIS 175

BLAKE BURTON and MICHAEL BURTON, v. HARDWOOD PALLETS, INC., ROBERT MCKENZIE, and EDWIN REEVES

No. E2003-01439-COA-R3-CV

COURT OF APPEALS OF TENNESSEE, AT KNOXVILLE

2004 Tenn. App. LEXIS 175

February 5, 2004, Session
March 22, 2004, Filed

**PRIOR HISTORY:** [*1] *Tenn. R. App. P.3* Appeal as of Right; Judgment of the Circuit Court Affirmed. Direct Appeal from the Circuit Court for Hamilton County. No. 98-C-1394. Hon. Samuel H. Payne, Circuit Judge.
*Burton v. Hardwood Pallets, 2001 Tenn. App. LEXIS 912 (Tenn. Ct. App., Dec. 13, 2001)*

**DISPOSITION:** Affirmed and remanded.

**COUNSEL:** Michael A. Anderson, Chattanooga, Tennessee, for Appellants.

Scott N. Brown and Neil A. Brunetz, Chattanooga, Tennessee, for Appellees.

**JUDGES:** HERSCHEL PICKENS FRANKS, J. delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

**OPINION BY:** HERSCHEL PICKENS FRANKS

**OPINION**

The Trial Court granted defendants Summary Judgment on claims of fraud in the inducement to contract. On appeal, we Affirm.

In this action the Trial Court granted the defendants summary judgment on plaintiffs' claim that they were fraudulently induced to enter into a contract for the sale of their business. The Complaint filed in this case is not in the record. However, the Trial Court sets forth plaintiffs' theory of recovery in its Memorandum Opinion:

The plaintiffs' sole remaining claim before the Court as argued at the hearing on the Motion for Summary Judgment was that Robert McKenzie and Edwin Reeves agreed orally in negotiations prior [*2] to closing to personally guaranty the debt of Hardwood Pallets, Inc., to plaintiffs and failed and refused to do so in writing at the closing.

By way of background, plaintiffs owned and operated a pallet manufacturing plant and Ed Reeves and Robert McKenzie owned Hardwood Pallets, Inc., a local competing pallet business. The parties were brought together through the efforts of Phil Bacon, a real estate broker. Over a period of weeks negotiations followed and the parties agreed that Hardwood Pallets, Inc., would purchase the assets of plaintiffs' company. The final negotiated purchase price was $ 2,498,920.00. Plaintiffs agreed to finance $ 1,000,000.00 of the deal, which was later reduced to $ 800,000.00.

Viewing the record in the light most favorable to the plaintiffs, they insisted upon a security interest in the collateral in return for financing a substantial part of the sale. McKenzie and Reeves represented to plaintiffs that they would personally guaranty Hardwood Pallets debt to plaintiffs.[1] Counsel for all parties were furnished with all documents prior to closing, which included the promissory note, the subordination agreement, and the asset purchase agreement. There [*3] were no personal guaranties among the documents. Plaintiffs were represented by an attorney who appeared at the closing. Plaintiffs executed the documents, but Blake Burton testified that had he known the true circumstances and import of the documents, he would have never closed the deal. He recited that defendants promised him a personal guaranty and a junior security interest in the collateral. Although he offered no specific facts that the defendants schemed to cheat him, he was of the opinion that they never intended to pay him for his company.

---

1   The affidavit of Robert McKenzie categorically denies that the events or conversation occurred as described by plaintiffs.

The detailed Asset Purchase Agreement provides in pertinent part:

On the closing date, Purchaser will execute an unsecured Promissory Note to Blake Burton, d/b/a Burton Lumber Company (a/k/a Burton Pallet Company) . . .

The Note itself provides:

This Note may not be changed orally, but only in a writing signed by the parties against whom [*4] enforcement of any waiver, change, modification or discharge as sought.

The Asset Purchase Agreement under Article 9 provides:

Integration. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings.

Summary judgment involves questions of law and appellate review is *de novo* with no presumption of correctness of the trial court's conclusions. *Tenn. R. App. P. 13(d)*. *Robinson v. Omer, 952 S.W.2d 423, 426 (Tenn. 1997)*. We are required to review the evidence in the light most favorable to the non-moving party and draw all legitimate inferences in its favor. *Byrd v. Hall, 847 S.W.2d 208 (Tenn. 1993)*. A party confronted with a Motion for Summary Judgment must produce legally competent material evidence of fraud to successfully oppose the motion that would be admissible in evidence. Subjective beliefs and other non-specific information are legally insufficient to defeat a Motion for Summary Judgment. *Long v. State Farm Fire & Casualty Co., 510 S.W.2d 517, 519 (Tenn. Ct. App. 1974)*.

Promissory fraud entails misrepresentations, [*5] promises of future conduct by the promissor with no intention to perform at the time the promise is made. *Oak Ridge Precision Ind. Inc., v. First Tennessee Bank Nat's Ass'n., 835 S.W.2d 25 at 29 (Tenn. Ct. App. 1992)*. Evidence of the lack of present intent to perform a promise in a future contract must be demonstrated by something other than a mere failure to keep the promise or the subjective impression of the promise. *Id.*

Proof of fraud in the inducement or promissory fraud is limited to subject matter which does not contradict or vary the terms that are plainly expressed in the written contract. *Airline Const. Co., v. Barr, 807 S.W.2d 247, 259 (Tenn. Ct. App. 1990)*; *Lyons v. Farmers Ins. Exchange, 26 S.W.3d 888, 891 (Tenn. Ct. App. 2000)*; *Eatherly v. Morc Inc., 585 S.W.2d 631, 636 (Tenn. Ct. App. 1979)*. In discussing fraudulent inducement, *37 Am.Jur.2d Fraud and Deceit § 242* states:

**Deception inducing action**

The tort of fraud requires proof of a successful deception and action taken by the person deceived that would not have otherwise been taken. For a party [*6] to be deceived, it must have reasonably relied on a false statement. Lack of evidence that the plaintiff relied on an alleged deception precludes a recovery for fraudulent concealment and fraudulent misrepresentation.

. . .

Thus, where false representations are made to induce another to act, and, before such other does act, he or she learns of the falsity of such representations, such person cannot rely on them believing them to be true, for knowing of their falsity, that person has not been deceived and any loss is self-inflicted.

Counsel for all parties were furnished copies of the closing documents in advance of the closing, and at the closing plaintiffs signed the documents effecting the transfer. Under the familiar rule, they are charged with knowledge of the contents of the documents they signed. Assuming, as we must, that defendants promised to give plaintiffs a personal guaranty, plaintiffs are bound to the knowledge that at the closing no personal guaranty was contained in the Contracts. Indeed, the Contract clearly expresses that there would be no personal guaranty on the Promissory Note, and defendants claim that they were fraudulently induced to enter into the Contract [*7] of Sale is negated by this uncontradicted evidence in this record.

For the foregoing reasons, we affirm the Judgment of the Trial Court and remand, with the cost of the appeal assessed to Blake Burton and Michael Burton.

HERSCHEL PICKENS FRANKS, J.

Case 1:08-cv-03252     Document 34-3     Filed 05/22/2008     Page 3 of 3